**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ALICE BAKER, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IDSCAN.NET, INC.,<br><br>Defendant. | Case No. 2:26-cv-02164<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Alice Baker ("Plaintiff"), individually, and on behalf of all others similarly situated, brings this action against Defendant IDScan.net, Inc. ("IDScan.net" or "Defendant"). Plaintiff brings this action by and through her attorneys, and alleges, based upon personal knowledge as to her own actions, and based upon information and belief and reasonable investigation by her counsel as to all other matters, as follows.

## I. INTRODUCTION

1. IDScan.net is a technology company that provides identification verification services to private and public sector entities that must verify an individual's identity before providing goods or services, such as hotels, bars, rental car companies, insurance companies, casinos, cannabis dispensaries, and DMVs. These entities request government-issued identification, such as passports or driver's licenses, from their customers, which are then scanned by special IDScan.net machines that use normal, infrared, and ultraviolet lights to create high resolution digital scans of these identification documents. These digital scans are then transmitted to IDScan.net servers for processing and verification.

2. Thus, as part of its operations, IDScan.net collects, maintains, and stores a massive volume of highly sensitive "personally identifying information" ("PII") belonging to members of the public, in the form of full front and back scans of government-issued IDs which contain information such as their full legal names, dates of birth, home address, protected health information ("PHI") and biometric information such as height, eye color, and hair color (collectively, "Private Information").

3. On August 31, 2026, security researcher Brian Krebs was made aware of an ominous posting on the Russian cybercrime forum Exploit, which advertised full access to digital scans of identity documents belonging to over 170 million individuals across the United States and Canada.[1] Following this advertisement took Mr. Krebs to a dark web site called Nexus, which had only been set-up the week prior, and advertised itself as a marketplace with an inventory comprising at least 153 million drivers licenses for people in the United States and Canada,10 million identification cards, three million travel documents and/or international IDs, and at least 579,000 medical cards.[2] Nexus claimed that the records in its inventory were stocked from "an active breach at a major identity verification company."[3] To verify these claims, Mr. Krebs ran searches for himself in the database and found a 'sample' partial photo scan of his driver's license and some basic information on himself, with the full-scan and the rest of his information locked behind a paywall. "The record featuring my drivers license includes six image files: three pairs of photos of the license's front and back, a basic image scan, as well as infrared and ultraviolet versions of the same images. A date and timestamp is appended to each image file, and the

[1] Brian Krebs, *FBI Probes Service Selling 153M+ Drivers Licenses*, KrebsonSecurity (September 1, 2026), available at https://krebsonsecurity.com/2026/09/fbi-probes-service-selling-153m-drivers-licenses/.
[2] *Id.*
[3] *Id.*

timestamp on my license scan corresponds to a date in June 2025 when I took a flight to the midwest United States to attend a family funeral."[4] Mr. Krebs then searched in the database for a dozen friends and family members and also found their ID scans for sale.[5] He then ran searches for prominent members of the public and found their ID scans for sale as well, including driver's license scans for Secretary of Defense Pete Hegseth and the assistant director of the FBI.[6]




*Figure 1*[7]

4. Nexus claimed that the data breach at the identification verification company was ongoing, and Mr. Krebs determined that to be a believable claim as when he returned to Nexus 24 hours later on September 1, 2026, over 400,000 additional records had been harvested and uploaded for sale. After further investigation, Mr. Krebs identified IDScan.net as the "major

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*

identity verification company" that was identified as the victim of the "ongoing data breach" (the "Breach" or "Data Breach").[8] Later on September 1, 2026, Mr. Krebs was invited to a conference call with multiple FBI agents, and during the call Mr. Krebs learned that the FBI was investigating the breach at IDScan.net.[9]

5. Accordingly, Plaintiff brings this action on behalf of all those similarly situated to seek relief for, *inter alia*, the consequences of Defendant's failure to reasonably safeguard their Private Information; its failure to reasonably provide timely notification to Plaintiff and Class members that their Private Information had been compromised; and for Defendant's failure to inform Plaintiff and Class members concerning the status, safety, location, access, and protection of their Private Information.

## II. PARTIES

**Plaintiff Alice Baker**

6. Plaintiff Baker is a resident and citizen of Gary, Indiana. Upon information and belief, Plaintiff Baker's information was stored on IDScan.net systems and was subsequently stolen and offered for sale on the dark web.

**Defendant IDScan.net, Inc.**

7. IDScan.net, Inc.is a Delaware corporation with its principal place of business located at 2045 Lakeshore Drive, Suite 526, New Orleans, Louisiana 70122. Defendant conducts business nationally from its headquarters in New Orleans.

---

[8] *Id.*; Zach Whittaker, TechCrunch (September 2, 2026), available at https://techcrunch.com/2026/09/02/it-sure-looks-like-hackers-breached-a-major-id-card-verification-service/.

[9] Brian Krebs, *FBI Probes Service Selling 153M+ Drivers Licenses*, KrebsonSecurity (September 1, 2026), available at https://krebsonsecurity.com/2026/09/fbi-probes-service-selling-153m-drivers-licenses/.

## III. JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

9. This Court has personal jurisdiction over Defendant because Defendant is headquartered in Louisiana.

10. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this District and because Defendant resides in this District.

## IV. FACTUAL ALLEGATIONS

### A. IDScan.net – Background

11. IDScan.net provides identity verification services to public and private sector entities such as hotels, bars, casinos, cannabis dispensaries, and DMVs. Members of the public provide these entities with their government-issued identification such as driver's licenses and passports. Employees of the entities then scan the IDs front and back, and send the scanned images digitally to IDScan.net for processing and verification.

12. IDScan.net's identity verification services are offered through several product lines such as VeriScan, DIVE, and ParseLink, and are offered to help businesses prevent fraud and comply with government requirements.

13. On its website, IDScan.net proudly "states that the company provides identity verification services for numerous big brands, including Hertz, Target, Fedex, Motorola Solutions,

the financial services giant Jack Henry, and Caesars Entertainment. And as idscan.net's own documentation states, the technology scans IDs with both infrared and ultraviolet light. Idscan.net says the company's systems and technology perform more than 21 million verifications monthly, at more than 20,000 locations around the world."[10]

14. IDScan.net maintained all of the digital scans in its systems, and upon information and belief, it retained scans from entities that terminated its partnership with IDScan.net and ceased utilizing its services.

15. Upon information and belief, IDScan.net failed to implement necessary data security safeguards at the time of the Data Breach. This failure resulted in cybercriminals accessing the Private Information of millions of individuals (Plaintiff and Class members) and listing it for sale on the dark web.

16. Individuals whose Private Information was provided to IDScan.net, such as Plaintiff and Class members, made their Private Information available with the reasonable expectation that any entity with access to this information would keep that sensitive and personal information confidential and secure from illegal and unauthorized access. They similarly expected that, in the event of any unauthorized access, these entities would provide them with prompt and accurate notice.

17. This expectation was objectively reasonable and based on an obligation imposed on IDScan.net by statute, regulations, industrial customs, and standards of general due care.

18. Had they known that Defendant's systems were vulnerable and open to attack, Plaintiff and Class members, as reasonable individuals, would have taken steps to prevent their Private Information from being transmitted to Defendant.

[10] *Id.*

19. Unfortunately for Plaintiff and Class members, IDScan.net failed to carry out its duty to safeguard sensitive Private Information and provide adequate data security. As a result, it failed to protect Plaintiff and Class members from having their Private Information accessed and stolen during the Data Breach and listed for sale.

**B. <u>The Data Breach</u>**

20. Little public information is currently known about the Data Breach as investigation remains ongoing.

21. However, it is indisputable that full digital scans of at least 153 million drivers licenses, 10 million identification cards, 3 million travel documents and/or international IDs, and 579,000 medical cards were stolen from IDScan.net servers and offered for sale on the Nexus dark web marketplace.[11]

22. These scans were collected from the public through IDScan.net's 21 million monthly verifications across 20,000 locations and they represent an enormous volume of highly sensitive Private Information that should have received the utmost protection and security,

**C. <u>IDScan.net's Many Failures Both Prior to and Following the Breach</u>**

23. The Data Breach and the injuries it caused to Plaintiff and Class members occurred as direct, proximate, and foreseeable results of multiple failings on the part of Defendant.

24. First, Defendant inexcusably failed to implement reasonable security protections to safeguard its information systems and databases.

25. Second, upon information and belief, Defendant failed to timely detect this data breach with Defendant's computer systems, becoming aware of the intrusion only after Mr. Krebs

---

[11] *Id.*

released his bombshell findings and only after the stolen Private Information was offered for sale on the dark web.

26. Third, Defendant failed to inform the public that its data security practices were deficient and inadequate. Had Plaintiff and Class members been aware that Defendant did not have adequate safeguards in place to protect such sensitive Private Information, they would have taken steps to prevent their information from being transmitted or stored by Defendant.

## D. The Age-Old Trade for Stolen Data and the Rise of Data Breaches

27. While the prevalence and severity of data breaches have increased exponentially over the past five years, the illicit trade of stolen data dates back to the earliest days of the internet. In the 1990s, cybercriminals sold stolen data through Internet Relay Chat (IRC) channels, which were primitive message boards and instant messaging services, before transitioning to dedicated web forums in the early 2000s.[12] These forums became havens for cybercriminals of all stripes where "individuals advertised their services to other users. Forums quickly gained popularity and became successful businesses with vendors selling stolen credit cards, malware, and related goods and services to misuse personal information and enable fraud."[13]

28. A forum known as ShadowCrew, which operated for just two years before being shut down by a law enforcement task force operation in 2004, served as the most prominent port of call during this era, and its members managed to traffic over 1.7 million stolen credit card details in the brief period of time it was online.[14]

[12] Thomas Holt, *How massive data breaches flood illicit markets while personal information fuels cybercrime economy*, Milwaukee Independent (November 12, 2025), available at https://www.milwaukeeindependent.com/syndicated/massive-data-breaches-flood-illicit-markets-personal-information-fuels-cybercrime-economy/.
[13] *Id.*
[14] *Id.*

29. The end of ShadowCrew did not dampen the illicit trade in stolen data. Instead, the trade moved to the dark web where it thrives to this day. Gone are the days of archaic IRC channels and dusty forums; stolen data is now traded on dedicated webpages serving as veritable e-commerce stores (akin to Amazon, eBay, and Alibaba) for stolen data of all kinds, complete with eye-catching webpages, distinct branding, and advertising to attract customers.[15] The vendors operating from these dark web storefronts are "frequently offer discounts and promotions to buyers to attract customers and keep them loyal," and offer clearance sales on old and/or expiring inventory, such as expiring credit card numbers, in a macabre reflection of commercial practices from the right side of the law.[16]

30. This decades-old black market for stolen data continues to thrive, and stolen PII, PHI, and financial account information are exchanged as simple commodities with prices set by the brutal and invisible hand of economics. Typically, online banking login information can be purchased for $100 each, full credit card details can be purchased for between $10 and $100, and comprehensive data packages which can enable complete theft of an individual's identity can be purchased for $1,000 or more.[17]

31. For criminals, the ROI on purchased information can be exceptional despite the dubious nature of black-market dealings and the inherent risks therein. For example, a cybercriminal "who buys 100 cards for $500 can recoup costs if only 20 of those cards are active

[15] *Id.*
[16] *Id.*
[17] Ryan Smith, *Revealed-how much is personal information worth on the dark web?*, Insurance News (May 1, 2023), available at https://www.insurancebusinessmag.com/us/news/breaking-news/revealed--how-much-is-personal-information-worth-on-the-dark-web-444453.aspx.

and can be used to make an average purchase of $30."[18] Based on these incentives, data breaches "are likely to continue as long as there is demand for illicit, profitable data."[19]

32. In this thriving black market, the producers are the cybercriminals who steal information to sell. And fueled by the voracious demand for stolen data in this thriving black market, dedicated gangs and organized crime rings have stepped up to meet the market demand, which has resulted in a precipitous increase in the number of data breaches in recent years.

33. The Identity Theft Resource Center's ("ITRC") Annual End-of-Year Data Breach Report for 2025 listed 3,322 data breach incidents which occurred in 2025, for which 232,726,796 individual victim notices were dispatched.[20] Indeed, 2025 handily dethroned 2023 as the most prolific year for data breaches, which previously held the title with 3,205 data breaches for which over 420 million individual victim notices were dispatched.[21]

34. Data breaches show no sign of abating. Statista, a German entity that collects and markets data relating to, *inter alia*, data breach incidents and the consequences thereof, reported 3,322 data breach incidents in the United States in 2025, 3,152 data breach incidents in 2024, 3,205 incidents in 2023, and 1,798 incidents in 2022.[22]

---

[18] Thomas Holt, *How massive data breaches flood illicit markets while personal information fuels cybercrime economy*, Milwaukee Independent (November 12, 2025), available at https://www.milwaukeeindependent.com/syndicated/massive-data-breaches-flood-illicit-markets-personal-information-fuels-cybercrime-economy/.

[19] *Id.*

[20] *2025 Data Breach Report*, Identity Theft Resource Center (January 2026), available at https://www.idtheftcenter.org/publication/2025-data-breach-report/.

[21] *Id.*

[22] *Number of data compromises and individuals impacted in the United States from 2021 to 2025*, Statista (February 15, 2026), available at https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/.




Figure 2 – *Number of Data Breaches and Affected Individuals from 2005 to 2024.* [23]

## E. How the Theft and Sale of Data Harms Victims and Organizations

35. Individuals who have unfortunately had their information stolen and sold on the black-market face severe consequences which belie the blatant ubiquity of such transactions. According to a recent study published in the scholarly journal *Preventive Medicine Reports*, public and corporate data breaches strongly correlate to an increased risk of identity theft for victimized consumers, with one in four victims of a data breach inevitably experiencing some type of identity theft.[24]

[23] *Id.*
[24] David Burnes, Marguerite DeLiema, Lynn Langton, *Risk and protective factors of identity theft victimization in the United States*, Preventive Medicine Reports, Volume 17 (January 23, 2020), available at https://www.sciencedirect.com/science/article/pii/S2211335520300188?via%3Dihub.

36. Using this stolen information, criminals and other unsavory groups can fraudulently take out loans under the victims' names, open new lines of credit, open new bank accounts for purposes of committing fraud, and file fraudulent tax returns using stolen credentials.[25]

37. Victims can even face criminal charges as a result of identity theft and typically experience significant emotional distress:

> Having your identity stolen can be traumatic. Nearly 9 in 10 respondents (87%) in the ITRC survey reported feeling anxious or worried in the wake of identity theft; 77% felt violated, and an alarming 16% reported feeling suicidal in the months following identity theft. Identity theft victims report feeling unable to trust friends (34%) and family members (33%). More than half (52%) say they feel embarrassed or ashamed, even though ID theft can be difficult for the average person to detect and thwart, and some forms of identity theft, such as data breaches, are beyond the victims' control. Shame, suspicion and a feeling you should be curtailing your activity to prevent further theft can lead to isolation.[26]

38. The consequences of identity theft do not resolve quickly. In a survey of identity theft victims conducted by the Identity Theft Research Center (ITRC), 77% of respondents reported having at least some financial problems following identity theft, with 61% saying they had difficulty covering basic needs. Although 28% said they resolved their issues within six months of an ID theft incident, 65% said issues remained unresolved even after a year.[27]

39. On average, victims of identity theft spend $1,200 to restore their identity and resolve damage to their credit, which includes payments to specialists and attorneys and lost wages.[28]

---

[25] United States Social Security Administration, *Identity Theft and Your Social Security Number*, United States Social Security Administration (July 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.
[26] Gayle Sato, What Are the Unexpected Costs of Identity Theft? Experian (July 30, 2024), available at https://www.experian.com/blogs/ask-experian/what-are-unexpected-costs-of-identity-theft/.
[27] *Id.*
[28] Alexandria White and Dan Avery, What is identity theft insurance? CNBC Select (March 17, 2025), available at https://www.cnbc.com/select/id-theft-

40. Data breaches have also proven to be costly for affected organizations as well, with the average cost to resolve being $4.45 million dollars in 2023.[29] The average cost to resolve a data breach involving health information, however, is more than double this figure at $10.92 million.[30]

41. Furthermore, even if only a select few categories of Private Information is compromised in a breach, cybercriminals can use these pieces of stolen information to create a "mosaic" of information on each victim. In effect, cybercriminals can use the information stolen in one breach and connect it to other available information on the victims, which are data-mined from publicly available sources or illegally obtained from other breaches. Thus, even if certain categories of information such as emails, phone numbers, or credit card information were not compromised in this Data Breach, criminals can easily 'fill in the blanks' using these "mosaics" and correctly answer security questions and pass 2FA security checks, granting them access to victims' email accounts, financial accounts, and social media accounts to cause havoc.

42. A particularly troubling extension of these "mosaics" is the creation of "Fullz" packages. A "Fullz" package is a comprehensive dossier of information that cybercriminals compile on individuals, often through the use of automated programs, which represents an alarmingly accurate and complete profile of a given individual. These "Fullz" packages are sold for profit on the dark web to any individual willing and able to pay the price, be they cybercriminals seeking to perpetuate financial crimes, stalkers seeking information on their targets, or rivals

---

insurance/#:~:text=Victims%20of%20identity%20theft%20spend,lost%20wages%20and%20other%20expenses.

[29] *Cost of a Data Breach Report 2023*, IBM Security, available at https://www.ibm.com/reports/data-breach?utm_content=SRCWW&p1=Search&p4=43700072379268622&p5=p&gclid=CjwKCAjwxOymBhAFEiwAnodBLGiGtWfjX0vRlNbx6p9BpWaOo9eZY1i6AMAc6t9S8IKsxdnbBVeUbxoCtk8QAvD_BwE&gclsrc=aw.ds.

[30] *Id.*

seeking to destroy someone's reputation.

43. Upon information and belief, this has already transpired (and will continue to transpire) for Plaintiff and the Class. And any reasonable trier of fact could find that Plaintiff and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach. There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class members' Private Information will do so at a later date or re-sell it.

**F. <u>The Unique Severity of Medical Data Breaches</u>**

44. Much like standard data breaches, data breaches involving medical information is also pervasive. The HIPAA Journal's 2025 Health Care Data Breach Report noted 710 data breaches involving 500 or more healthcare records, though the HIPAA Journal believes this is greatly understated due to the effects of the prolonged government shutdown.[31] Indeed, Medical identity theft has seen a seven-fold increase over the last five years and this explosive growth far outstrips the increase in incidence of traditional identity theft.[32]

45. Stolen medical records are some of the most sought after and expensive commodities on the dark web, commanding prices from $250 to $1,000 each.[33] Medical records

---

[31] Steve Adler, *2025 Healthcare Data Breach Report, The HIPAA Journal* (February 13, 2026), available at https://www.hipaajournal.com/2025-healthcare-data-breach-report/; The HIPAA Journal bases its numbers on the medical data breaches reported to the Department of Health and Human Services' (HHS) Office for Civil Rights (OCR). The OCR makes these reports publicly available; however, the HIPAA Journal believes OCR has been experiencing delays in processing and publicizing its reports due to the government shutdown.

[32] Medical Identity Theft, AARP (March 25, 2022), available at: https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html.

[33] Paul Nadrag, *Capsule Technologies, Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web*, Fierce Healthcare (January 26, 2021), available at: https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web.

are considered valuable because unlike credit cards, which can easily be canceled, and social security numbers, which can be changed, medical records contain "a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information."[34] With this bounty of ill-gotten information, cybercriminals can steal victims' public and insurance benefits and bill medical charges to victims' accounts.[35] Cybercriminals can also change the victims' medical records, which can lead to misdiagnosis or mistreatment when the victims seek medical treatment.[36] Victims of medical identity theft could even face prosecution for drug offenses when cybercriminals use their stolen information to purchase prescriptions for sale in the drug trade.[37]

46. The wrongful use of compromised medical information, known as medical identity theft, is far more harmful than standard identity theft. Victims of medical identity theft spend an average of $13,500 to resolve the consequences, and there are currently no laws limiting a consumer's liability for fraudulent medical debt (in contrast, a consumer's liability for fraudulent credit card charges is capped at $50).[38] It is also "considerably harder" to reverse the damage from the typical consequences of medical identity theft.[39]

---

[34] *Id.*
[35] *Medical Identity Theft in the New Age of Virtual Healthcare*, IDX (March 15, 2021), available at https://www.idx.us/knowledge-center/medical-identity-theft-in-the-new-age-of-virtual-healthcare. *See also* Michelle Andrews, *The Rise of Medical Identity Theft*, Consumer Reports (August 25, 2016), available at https://www.consumerreports.org/health/medical-identity-theft-a1699327549/; *Data Breaches: In the Healthcare Sector*, CTR. FOR INTERNET SEC., https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited December 1, 2024).
[36] *Id.*
[37] *Id.*
[38] Medical Identity Theft, AARP (March 25, 2022), available at: https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html.
[39] *Id.*




Figure 3 – *Number of Individuals Affected by Healthcare Data Breaches from 2009 to 2024.*[40]

47. In light of the dozens of high-profile health and medical information data breaches that have been reported in recent years, entities charged with maintaining and securing PHI, such as Defendant, should know the importance of protecting that information from unauthorized disclosure. Indeed, Defendant knew, or certainly should have known, of the recent and high-profile data breaches in the health care industry: UnityPoint Health, Lifetime Healthcare, Inc., Community Health Systems, Kalispell Regional Healthcare, Anthem, Premera Blue Cross, and many others.[41]

48. In addition, the Federal Trade Commission ("FTC") has brought dozens of cases against companies that have engaged in unfair or deceptive practices involving inadequate protection of consumers' personal data, including recent cases concerning health-related information against LabMD, Inc., SkyMed International, Inc., and others. The FTC publicized these enforcement actions to place companies like Defendant on notice of their obligation to safeguard customer and patient information.[42]

49. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data

---

[40] Steve Adler, 2024 Healthcare Data Breach Report, The HIPAA Journal (January 30, 2025), available at https://www.hipaajournal.com/december-2023-healthcare-data-breach-report/.

[41] *See, e.g.*, Steve Adler, *Healthcare Data Breach Statistics*, HIPAA Journal (November 25, 2024), available at: https://www.hipaajournal.com/healthcare-data-breach-statistics.

[42] *See, e.g.*, *In the Matter of SKYMED INTERNATIONAL, INC.*, C-4732, 1923140 (F.T.C. Jan. 26, 2021).

breach, because credit card victims can cancel or close credit and debit card accounts.[43] The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

50. Given the nature of Defendant's Data Breach, as well as the length of the time Defendant's networks were breached and the long delay in notification to victims thereof, it is foreseeable that the compromised Private Information has been or will be used by hackers and cybercriminals in a variety of devastating ways.

51. Despite the prevalence of public announcements of data breach and data security compromises, its own acknowledgment of the risks posed by data breaches, and its own acknowledgment of its duties to keep Private Information private and secure, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class members from misappropriation. As a result, the injuries to Plaintiff and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures.

## G. Defendant Had a Duty and Obligation to Protect Private Information

52. Defendant has an obligation to protect the Private Information belonging to Plaintiff and Class members. First, this obligation was mandated by government regulations and state laws, including HIPAA and FTC rules and regulations. Second, this obligation arose from industry standards regarding the handling of sensitive PII and medical records. Third, Defendant imposed such an obligation on itself with its promises regarding the safe handling of data.

---

[43] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes (Mar 25, 2020), available at https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1. *See also Why Your Social Security Number Isn't as Valuable as Your Login Credentials*, Identity Theft Resource Center (June 18, 2021), available at https://www.idtheftcenter.org/post/why-your-social-security-number-isnt-as-valuable-as-your-login-credentials/.

**1. <u>HIPAA Requirements and Violation</u>**

53. HIPAA requires, *inter alia*, that Covered Entities and Business Associates implement and maintain policies, procedures, systems and safeguards that ensure the confidentiality and integrity of PII and PHI, protect against any reasonably anticipated threats or hazards to the security or integrity of PII and PHI, regularly review access to data bases containing protected information, and implement procedures and systems to detect, contain, and correct any unauthorized access to protected information. *See* 45 CFR § 164.302, *et seq.*

54. HIPAA, as applied through federal regulations, also requires private information to be stored in a manner that renders it, "unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology. . . ." 45 CFR § 164.402.

55. The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, requires entities to provide notice of a data breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***" (emphasis added).

56. Defendant failed to implement and/or maintain procedures, systems, and safeguards to protect the Private Information belonging to Plaintiff and Class members from unauthorized access and disclosure.

57. Upon information and belief, Defendant's security failures include, but are not limited to:

a. Failing to maintain an adequate data security system to prevent data loss;

b. Failing to mitigate the risks of a data breach and loss of data;

c. Failing to ensure the confidentiality and integrity of electronic protected health information Defendant creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information

to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f. Failing to identify and respond to suspected or known security incidents;

g. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i. Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR 164.306(a)(4); and

k. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

58. Upon information and belief, Defendant also failed to store the information it collected in a manner that rendered it, "unusable, unreadable, or indecipherable to unauthorized persons," in violation of 45 CFR § 164.402.

**2. <u>FTC Act Requirements and Violations</u>**

59. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the

Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

60. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[44] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[45] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[46] Defendant clearly failed to do any of the foregoing, as evidenced by the length of the Data Breach, the fact that the Breach went undetected, and the amount of data exfiltrated.

61. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

62. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and

[44] *Protecting Personal Information: A Guide for Business*, Federal Trade Comm'n (October 2016), available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed August 15, 2023).
[45] *Id.*
[46] *Id.*

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

63. Additionally, the FTC Health Breach Notification Rule obligates companies that suffered a data breach to provide notice to every individual affected by the data breach, as well as notifying the media and the FTC. *See* 16 CFR 318.1, *et seq.*

64. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

65. Defendant was fully aware of its obligation to protect the Private Information in its possession. Defendant is a sophisticated and technologically savvy business that relies extensively on technology systems and networks to maintain its practice, including collecting and storing massive volumes of Private Information as part of its business.

66. Defendant had and continues to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between Defendant and Plaintiff and Class members. Defendant alone had the exclusive ability to implement adequate security measures to its cyber security network to secure and protect Plaintiff's and Class members' Private Information.

### 3. <u>Industry Standards and Noncompliance</u>

67. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

68. Experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

69. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[47]

70. The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

---

[47] *The 18 CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-list (last visited Feb. 11, 2026).

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

71. Further still, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including: (i) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (ii) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (iii) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[48]

72. Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls

[48] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations (last visited Feb. 11, 2026).

(CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

73. Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**4. Defendant's Own Stated Policies and Promises**

74. Defendant publishes its "Master Services Agreement" on its website which "governs customer's access to and use of the Services."[49]

75. In this Agreement, IDScan.net unequivocally states that it "will implement and maintain reasonable administrative, technical, and organizational safeguards designed to protect Customer Data against unauthorized access, disclosure, alteration, or destruction. IDScan.net may update such safeguards from time to time to reflect evolving security standards, industry practices, and threats."[50]

76. Defendant failed to live up to its own stated policies and promises with regards to data privacy and data security as cybercriminals were able to infiltrate its systems and steal the Private Information belonging to Plaintiff and Class members.

**H. Plaintiff and the Class Suffered Harm Resulting from the Data Breach**

77. Like any data hack, the Data Breach presents major problems for all affected.[51] As discussed in detail above, Plaintiff and the Class are highly likely to experience identity theft and medical identity theft as a result of the Data Breach and, as also discussed in detail above, they are highly likely to experience significant harm as a result.

---

[49] https://idscan.net/master-services-agreement/
[50] *Id.*
[51] Paige Schaffer, *Data Breaches' Impact on Consumers*, Insurance Thought Leadership (July 29, 2021), available at https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers.

78. Here, due to the Breach, Plaintiff and Class members have been exposed to injuries that include, but are not limited to:

a. Theft of Private Information;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the Private Information stolen during the Data Breach;

c. Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

d. Costs associated with time spent to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite Defendant's delay in disseminating notice in accordance with state law;

e. The imminent and impending injury resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and

f. The loss of Plaintiff's and Class members' privacy.

79. As a direct and proximate result of Defendant's acts and omissions in failing to protect and secure Private Information, Plaintiff and Class members have been placed at a substantial risk of harm in the form of identity theft, and they have incurred and will incur actual damages in an attempt to prevent identity theft.

80. Plaintiff retains an interest in ensuring there are no future breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both themselves and similarly situated individuals whose Private Information was accessed in the Data Breach.

## I. <u>Plaintiff Baker's Experience</u>

81. Plaintiff Baker provided her driver's license to verify her age when purchasing alcohol from restaurants, bars, and stores. These restaurants, bars, and stores utilized IDScan.net's ID verification services and scans of Plaintiff Baker's driver's license were transmitted to IDScan.net's servers, processed for verification, and then stored on IDScan.net's systems.

82. Plaintiff Baker reasonably believes that scans of her driver's license were compromised and posted for sale in the Breach.

83. Shortly after the Breach, Plaintiff Baker began experiencing instances of identity theft. First, she observed a $39 charge from 'Chime' on her checking account, which was automatically flagged and blocked by her bank. Second, she received a notice from Credit Karma congratulating her on her new car purchase, which she did not do. Third, her employer informed her that somebody had contacted the payroll processor and changed her direct deposit details, and she had to cancel her payroll card and wait for a new card to be issued.

84. After the Breach, Plaintiff Baker also began receiving 10-15 spam calls daily.

85. Plaintiff Baker reasonably believes these incidents are caused by the Breach because they only began after the Breach, and she has not been the victim of any other data breach incident in the previous ten years,

86. As a result of the Data Breach, Plaintiff Baker had to spend time resolving the identity theft incidents and expended reasonable efforts in mitigating the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any additional indications of actual or attempted identity theft or fraud. Plaintiff has also spent several hours dealing with the Data Breach, valuable time Plaintiff

Baker otherwise would have spent on other activities, including, but not limited to, work and recreation.

87. As a result of the Data Breach, Plaintiff Baker has suffered anxiety due to the public dissemination of her personal information, which Plaintiff Baker believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her Private Information for purposes of identity theft and fraud. Plaintiff Baker is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

88. Plaintiff Baker suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from her; (b) violation of Plaintiff Baker's privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

89. As a result of the Data Breach, Plaintiff Baker anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach Plaintiff Baker is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V. CLASS ACTION ALLEGATIONS

90. Plaintiff brings this action on behalf of herself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose Private Information was accessed in the Data Breach.

Excluded from the Class are Defendant, its executives and officers, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change or expand the Class definition after conducting discovery.

91. Numerosity: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process. On information and belief, the number of affected individuals estimated to be in the millions. The members of the Class will be identifiable through information and records in Defendant's possession, custody, and control.

92. Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a. When Defendant learned of the Data Breach;

b. Whether hackers obtained Class members' Private Information via the Data Breach;

c. Whether Defendant's response to the Data Breach was adequate;

d. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

e. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

f. Whether Defendant owed a duty to safeguard their Private Information;

g. Whether Defendant breached its duty to safeguard Private Information;

h. Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class members;

i. Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class members;

j. Whether Defendant's conduct violated the FTCA and/or HIPAA;

k. Whether Defendant's conduct was negligent;

l. Whether Defendant's conduct was *per se* negligent;

m. Whether Defendant was unjustly enriched;

n. What damages Plaintiff and Class members suffered as a result of Defendant's misconduct;

o. Whether Plaintiff and Class members are entitled to actual and/or statutory damages; and

p. Whether Plaintiff and Class members are entitled to additional credit or identity monitoring and monetary relief.

93. Typicality: Plaintiff's claims are typical of the claims of the Class as Plaintiff and all members of the Class had their Private Information compromised in the Data Breach. Plaintiff's claims and damages are also typical of the Class because they resulted from Defendant's uniform wrongful conduct. Likewise, the relief to which Plaintiff are entitled to is typical of the Class because Defendant has acted, and refused to act, on grounds generally applicable to the Class.

94. Adequacy: Plaintiff is an adequate class representative because her interests do not materially or irreconcilably conflict with the interests of the Class they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the Class. Neither Plaintiff nor her counsel have any interests that are antagonistic to the interests of other members of the Class.

95. Superiority: Compared to all other available means of fair and efficient adjudication of the claims of Plaintiff and the Class, a class action is superior. The injury suffered by each

individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendant's records and databases.

## VI. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(By Plaintiff on behalf of the Class)**

96. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

97. Defendant owes a duty of care to protect the Private Information belonging to Plaintiff and Class members. Defendant also owes several specific duties including, but not limited to, the duty:

a. to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. to protect Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c. to have procedures in place to detect the loss or unauthorized dissemination of Private Information in its possession;

d. to employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class members pursuant to the FTCA;

e. to implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. to promptly notify Plaintiff and Class members of the Data Breach, and to precisely disclose the type(s) of information compromised.

98. Defendant also owes this duty because it had a special relationship with Plaintiff's and Class members. Plaintiff and Class members entrusted their Private Information to Defendant on the understanding that adequate security precautions would be taken to protect this information. Furthermore, only Defendant had the ability to protect its systems and the Private Information stored on them from attack.

99. Defendant also owes this duty because industry standards mandate that Defendant protect confidential Private Information in its possession.

100. Defendant also owes a duty to timely disclose any unauthorized access and/or theft of the Private Information belonging to Plaintiff and Class members. This duty exists to provide Plaintiff and Class members with the opportunity to undertake appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Private Information.

101. Defendant breached the duties it owed to Plaintiff and Class members by failing to take reasonable appropriate measures to secure, protect, and/or otherwise safeguard their Private Information.

102. Defendant also breached the duties it owed to Plaintiff and Class members by failing to timely and accurately disclose that their Private Information had been improperly acquired and/or accessed.

103. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members were damaged. These damages include, and are not limited to:

- Lost or diminished value of their Private Information;
- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;
- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; and
- Permanently increased risk of identity theft.

104. Plaintiff and Class members were foreseeable victims of any inadequate security practices on the part of Defendant and the damages they suffered were the foreseeable result of the aforementioned inadequate security practices.

105. In failing to provide prompt and adequate individual notice of the Data Breach, Defendant also acted with reckless disregard for the rights of Plaintiff and Class members.

106. Plaintiff and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(By Plaintiff on behalf of the Class)**

107. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

108. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, imposes a duty on Defendant to provide fair and adequate data security to secure, protect, and/or otherwise safeguard the Private Information of Plaintiff and Class members.

109. HIPAA imposes a duty on Defendant to implement reasonable safeguards to protect Plaintiff's and Class members' Private Information. 42 U.S.C. § 1320d, *et seq*.

110. HIPAA also requires Defendant to render unusable, unreadable, or indecipherable all Private Information it collected. Defendant was required to do so through "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

111. In the event of a data breach, HIPAA obligates Covered Entities and Business Associates to notify affected individuals, prominent media outlets, and the Secretary of the Department of Health and Human Services of the data breach without unreasonable delay and in no event later than 60 days after discovery of the data breach. 45 CFR § 164.400, *et seq.*

112. Defendant violated the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to secure, protect, and/or otherwise safeguard Plaintiff's and Class members' Private Information.

113. Defendant violated HIPAA by failing to properly encrypt the Private Information it collected.

114. Defendant's failure to comply with HIPAA and the FTCA constitutes negligence *per se*.

115. Plaintiff and Class members are within the class of persons that the FTCA and HIPAA are intended to protect.

116. The relevant portions of the FTCA and HIPAA inform Defendant's duties, particularly with regard to Defendant's duty to protect Private Information in its possession.

117. It was reasonably foreseeable that Defendant's breach of its duties, by failing to protect and secure Plaintiff's and Class members' Private Information in compliance with the FTCA and HIPAA standards, would result in that information being accessed and stolen by unauthorized actors and cybercriminals.

118. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class members have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to theft of their personal information, damages from the lost time and effort to mitigate the impact of the Data Breach, and permanently increased risk of identity theft.

119. Plaintiff and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class members.

**COUNT III**
**INVASION OF PRIVACY**
**(By Plaintiff on behalf of the Class)**

120. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

121. Plaintiff and Class members had a reasonable expectation of privacy in the Private Information that Defendant possessed and/or continues to possess.

122. By failing to keep Plaintiff's and Class members' Private Information safe, and by misusing and/or disclosing their Private Information to unauthorized parties for unauthorized use, Defendant invaded Plaintiff's and Class members' privacy by:

a. Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

b. Publicizing private facts about Plaintiff and Class members, which is highly offensive to a reasonable person.

123. Defendant knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's position would consider Defendant's actions highly offensive.

124. Defendant invaded Plaintiff's and Class members' right to privacy and intruded into Plaintiff's and Class members' private affairs by misusing and/or disclosing their private information without their informed, voluntary, affirmative, and clear consent.

125. As a proximate result of such misuse and disclosures, Plaintiff's and Class members' reasonable expectation of privacy in their Private Information was unduly frustrated and thwarted. Defendant's conduct amounted to a serious invasion of Plaintiff's and Class members' protected privacy interests.

126. In failing to protect Plaintiff's and Class members' Private Information, and in misusing and/or disclosing their Private Information, Defendant has acted with malice and oppression and in conscious disregard of Plaintiff's and Class members' rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing its own economic, corporate, and legal interests above the privacy interests of Plaintiff and Class members. Plaintiff, therefore, seeks an award of damages, including punitive damages, on behalf of themselves and the Class.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A. That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

B. That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

C. That the Court award Plaintiff and Class members compensatory, consequential, and general damages in an amount to be determined at trial;

D. That the Court award Plaintiff and Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

E. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

F. That the Court award pre- and post-judgment interest at the maximum legal rate;

G. That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

H. That the Court grant all other relief as it deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the putative Class, demands a trial by jury on all issues so triable.

Date: September 24, 2026

Respectfully Submitted,

*/s/ Scott J. Falgoust*

Scott J. Falgoust (LA S.B. # 33545)
Andrew A. Lemmon (LA S.B. # 18302)
**BRYSON HARRIS SUCIU & DEMAY, PLLC**
5301 Canal Boulevard
New Orleans, Louisiana 70124
Telephone: (919) 585-4634
Email: sfalgoust@brysonpllc.com

Nickolas J. Hagman*
Alex Lee*
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
nhagman@caffertyclobes.com
alee@caffertyclobes.com

* *Pro Hac Vice* forthcoming

*Attorneys for Plaintiff and the Proposed Class*